## WARD *v*. COOK.

1. PLEADING—INCONSISTENT COUNTS—ELECTION—ASSUMPSIT.
   A count for the recovery of money advanced under a contract to give plaintiff employment as a branch manager, which has been rescinded for breach of its conditions, may be joined with counts to recover for the advances made, founded on the theory that the contract has been rescinded for fraud, and the court cannot require the plaintiff to elect on which theory he will proceed.

2. SAME—FRAUD—SUFFICIENCY OF DECLARATION — REPRESENTATIONS.

Allegations of a declaration are sufficient to admit proof of fraudulent representations when it charges that the defendant falsely represented that he intended to establish a permanent branch office at Des Moines, Iowa, that he was the largest exclusive manufacturer of perfumes in the country, that the goods were equal in quality to the highest standard, and that experience was unnecessary to handle them.

3. FRAUD—CONTRACTS—RESCISSION BY PARTIES—EVIDENCE.

Correspondence between the parties prior to the making of the contract was admissible to show the representations made and relied on.

4. SAME—EVIDENCE—CONDUCT.

It is not error to admit testimony that the defendant did not invite tests of the goods to be furnished.

5. SAME—SUBSEQUENT CORRESPONDENCE AND CONDUCT.

No error is committed in receiving in evidence letters and acts of the plaintiff subsequent to the execution of the contract to show performance on his part and rescission of the contract.

6. SAME—FRAUD—BREACH OF CONTRACT.

Evidence that the office was fitted up with second-hand furniture, and that the goods were poorly packed and displayed, was admissible to show that the office was not intended to be permanent and that the defendant committed a breach of the contract.

7. SAME—QUALITY OF GOODS.

A sample case containing samples of the goods furnished was admissible to identify the subject-matter of tests made for the plaintiff of the quality of goods furnished.

8. SAME—REPRESENTATIONS AS TO SIZE OF BUSINESS.

The plaintiff was properly permitted to testify that he afterwards became suspicious as to the statement made by the defendant to the effect that he conducted the largest exclusive manufactory of the goods.

9. SAME—EVIDENCE OF SIMILAR FRAUDS.

Evidence of other similar contracts and transactions entered upon by the defendant is admissible to show fraudulent intent.

10. SAME.

Where the defendant objected to, and obtained the exclusion of, evidence that experience was necessary to sell the goods, testimony on his part that it was unnecessary was properly rejected.

11. SAME—EVIDENCE—CROSS-EXAMINATION.

Cross-examination to show where the defendant got the form of contract used was competent as bearing on the misrepresentation concerning the business which was referred to in the contract.

12. SAME.

Testimony tending to prove that the plaintiff relied on the false representations was admissible.

13. SAME.

The admission of such evidence as bore upon his reliance on representations which the court refused to submit to the jury was not prejudicial.

14. SAME—TRIAL—INSTRUCTIONS TO JURY.

A charge which informs the jury of the questions which may be determined by them is sufficient, in the absence of requests to charge that certain testimony should not be considered, where the court indicated during the trial his opinion as to the testimony.

15. SAME.

The words in an advertisement for a branch manager, "experience unnecessary," may be submitted to the jury as a fraudulent representation.

16. CONTRACTS—BREACH—AGREEMENT TO INSTRUCT IN BUSINESS.

Under the terms of a contract providing that the defendant should instruct the plaintiff in business which he was entering upon, until, in the estimation of the defendant, he was sufficiently instructed, the plaintiff was entitled to reasonable and good faith instructions.

17. DAMAGES—LOSS OF OTHER EMPLOYMENT.

Evidence of a loss of other employment caused by the fraud of the defendant was a proper subject for the consideration of the jury on the question of damages.

18. TRIAL—PRACTICE—SPECIAL QUESTIONS—JURY.

Special questions as to the plaintiff's reliance on the fraudulent representation that the defendant intended to establish a permanent office, the truth of the statement, and the amount of instructions given, were controlling of the issue, and were properly submitted to the jury.

Error to Wayne; Murphy, J. Submitted February 19, 1909. (Docket No. 23.) Decided October 4, 1909.

Assumpsit by John W. Ward against Cliff R. Cook for the recovery of moneys advanced under a contract of employment. A judgment for plaintiff is reviewed by defendant on writ of error. Affirmed.

*Frazer, Griswold & Slyfield,* for appellant.

*Graves, Hatch & Wasey,* for appellee.

McAlvay, J. Plaintiff, a resident of the State of Iowa, recovered in the Wayne circuit court a judgment against defendant, a resident of Detroit, for certain money paid and losses sustained under a certain contract between the parties. The defendant in 1905 caused to be inserted in newspapers in several States an advertisement reading as follows:

"Man, trustworthy. To manage branch office and distributing depot for large manufacturer; salary to start with $1,500 first year, and extra commissions and expenses. Applicant must have good reference and $1,000 cash. Capital secured, experience unnecessary. Address Manufacturer, 21 West Atwater Street, Detroit, Michigan."

Plaintiff saw this in the Chicago Record-Herald, and on September 25, 1905, answered it, stating his business experience, habits, present occupation, and ability to give references, and asked for full particulars. Defendant replied at length on September 27th, using the trade-name "The Elysian Manufacturing Co.," under which he was doing business. This letter contained statements that—

"It is our intention to open an office and distributing depot in your locality at an early date, and to enter into a business arrangement with a trustworthy and responsible man to manage the business. * * * We are willing to enter into a permanent arrangement with a satisfactory party, and will pay $1,500 per year, payable monthly for the first two years, and to this we will add a commission

of 5% on all goods sold through this department. * * *
The office and distributing depot is opened and furnished
at our expense. We shall pay all the running expenses
of the business, such as rents, postage, advertising, type-
writing, clerical help, etc. * * * We expect to send a man
from our experienced staff to instruct the manager thor-
oughly in all details of the work. * * * The cash capital
required on your part ($1,000) * * * can be withdrawn
in full at the expiration of any arrangement we shall make
with you. * * * Your capital is perfectly secure, as you
always have on hand either the cash or its equivalent in
merchandise."

Other letters followed, in one of which from defendant
was inclosed a booklet, which the letter stated was "de-
scriptive of part of the goods which we manufacture, and
which will give you some idea of our line." Another let-
ter stated:

"Inasmuch as we are the largest exclusive manu-
facturers of our line of goods in the country, we are in
position to meet any and all competition."

The description given in the booklet reads:

"Quality. Our perfumes and floral waters are equal
to the highest standard of such goods in this country or
Europe. We manufacture all the leading flower odors,
and after ten years' experience and successful manufac-
turing, we challenge comparison with any other like
goods without regard to price."

At the invitation of defendant plaintiff came to Detroit
and went to defendant's office. Plaintiff claims that he
was met by a man named McGuire, who stated that de-
fendant was busy, and could not see him, but he could
attend to the business just as well; that during the con-
versation which ensued, relative to the business, he asked
McGuire as to the quality of the goods manufactured,
and he produced a copy of the booklet, saying, as he re-
ferred to the page, that it described the quality of the
goods they manufactured; that he was taken into Mr.
Cook's office and introduced to him by McGuire, who did
practically all the business, even to preparing the con-

tract; that he saw defendant but a few moments at the time the contract was signed.

There is a sharp dispute between plaintiff and defendant as to what occurred at this time. McGuire was not produced as a witness.

The contract is as follows:

"This agreement, made and entered into this tenth day of October, 1905, by and between the Elysian Manufacturing Company, party of the first part, and J. W. Ward, party of the second part, witnesseth:

"That the parties hereto, after a personal interview, and after a personal examination by said second party, of the goods manufactured by said first party, have embodied the result of all previous and present negotiations into this writing, said agreement being as follows, to wit:

"(1) Said first party hereby engages the said second party in the capacity of general sales agent, to conduct a sales agency in the city of Des Moines, State of Iowa, for a period of two (2) years from the date that the sales office is opened for the second, as hereinafter provided for, and for and in consideration of the faithful performance and fulfillment of each and all of the several agreements herein contained and agreed to between the parties, the party of the first part agrees to engage the said second party for a period of twenty-four (24) months, and agrees to pay the party of the second part one hundred and fifty dollars ($150) per month, as hereinafter provided, and give five per cent. (5%) additional commission on all sales of said office during the continuance of this contract.

"(2) The party of the first part agrees, at its own expense, to open and fit up an office or salesroom for the use of the party of the second part, at said city, in which the party of the second part shall carry on said business as herein provided for, and the party of the first part further agrees to supply stationery and circulars for the proper handling of the business. Also to sell and deliver such stock as it manufactures and sells as the trade of said office may require from time to time at forty per cent. (40%) discount from retail list prices, and to supply merchandise for all moneys received from said second party, and to instruct said second party in the details of handling the business, until he is sufficiently instructed in the estimation of said first party.

"(3) At the expiration of the term and fulfillment of

this agreement, the party of the first part further agrees to repurchase from said second party all stock that he may have on hand, purchased from said first party, paying therefor in cash the same prices originally charged him.

"In consideration of the foregoing and subsequent agreements, the said second party agrees to the following:

"(1) The said party of the second part will and does hereby engage and agrees to become general sales agent for the goods manufactured and sold by the party of the first part, as heretofore stipulated, for a term of two (2) years, and that he will devote his whole time and efforts to advancing his success of the business, and to satisfactorily perform the duties herein required of him, dealing honorably with the party of the first part, the public, and all persons with whom he may have business relations.

"(2) That the said second party will supply no stock to agents, dealers, nor other purchasers from him that will in any way demoralize the trade, and only for cash with orders, or thirty (30) days' time, if secured by the indorsement of some financially responsible party, or on some satisfactory letters of credit. Said second party is to use due care and diligence in looking up the standing of people to whom goods are sold on credit, and then, if any losses arise, these losses are to be charged as an item of expense to the business.

"(3) Said second party further agrees to carry a stock of merchandise amounting to one thousand six hundred and sixty-six dollars and $\frac{66}{100}$ ($1,666.66) at list prices, which shall be an assortment of the various goods manufactured or handled by the said first party, such stock and assortment to be selected by the party of the first part, or to be jointly selected, and to be billed to said second party at forty per cent. (40%) discount from retail prices, amounting to one thousand dollars ($1,000) net.

"(4) The party of the second part further agrees to furnish the said first party with daily and weekly reports, and, at the end of each month, to forward to the party of the first part a report of all business done during the month, giving the names and addresses of any and all agents appointed, a full and accurate statement of expenditures, amount of goods sold, of money collected, and

any other information regarding the business that may be desired by the party of the first part.

"(5) As the permanent success of this business will depend upon a reasonable amount of merchandise being sold, it is understood and agreed that the sales of each month shall amount to five hundred dollars ($500), which shall be considered the minimum amount of business necessary to constitute the fulfillment of this contract. If the sales of any month shall not amount to the minimum amount, namely, five hundred dollars ($500), and during the succeeding months sales should be in excess of the minimum amount to make up an average of five hundred dollars ($500) per month, this contract will thereby be fulfilled in this respect by the party of the second part.

"If the sales at the end of the first year shall not have averaged five hundred dollars ($500) per month, the party of the first part reserves the right to cancel this contract, if it so desires, and upon such cancellation, shall repurchase from said second party, all stock that he may have on hand, purchased from said first party, at prices originally charged.

"All sales to be made to agents, demonstrators, and dealers at a discount of thirty-three and one-third per cent. ($33\frac{1}{3}$%) from list of retail prices.

"(6) It is mutually understood and agreed between the parties hereto that the said second party shall have the right and authority to collect all moneys for business done through said office, and that at the end of each month, after deducting from the receipts of this office, the amount of his own remuneration, to wit, one hundred and fifty ($150), and the necessary expenses, such as rent, necessary office help, postage, advertising matter, office sundries, commission, salary and commission to salesmen and demonstrators, etc., he shall remit with his monthly account the cash balance to said first party at its offices in the city of Detroit. When such remittance is received, the party of the first part will then replace all the stock sold during the previous month by the party of the second part, as herein provided, without additional charge or expense to said second party, and in case the minimum amount of business required to be transacted shall not be sufficient to pay the necessary expenses of the office as herein provided for, the cost of replacing stock, etc., such deficiency shall be made good by said first party at the end of each month.

"(7) It is further mutually agreed by both parties

hereto that the said second party shall have the right to renew this contract at its expiration, it being understood by both parties that the expenses incident to the opening of this office constitute the necessity of a permanent arrangement.

"In witness whereof, the parties of this contract have hereunto set their hands and seals in duplicate the date and year first above written.

"THE ELYSIAN MFG. CO.,<br>
"Per C. R. COOK.   [Seal.]<br>
"J. W. WARD.        [Seal.]

"Received of J. W. Ward, one thousand dollars ($1,000) in payment for stock as per above contract.

"THE ELYSIAN MFG. CO.,<br>
"Per C. R. COOK."

Plaintiff returned to his home in Iowa, and soon after, by appointment, met the accredited representative of defendant, who by his written instructions was authorized to open the office for plaintiff and thoroughly instruct him in all the details of the business. The only evidence as to these instructions is the testimony of plaintiff. The agent, Mr. Doud, was not called as a witness. Plaintiff says all the instructions he received were given him at an interview at a hotel of about 45 or 50 minutes, and consisted in the agent producing and opening a few samples, which he had, and reciting what the "booklet" said about them. He instructed him to insert "blind advertisements" in three newspapers in Des Moines for canvassers; to confine his bookkeeping to two small books, costing from 35 to 60 cents, and afterwards to use a complete set of books, which defendant would forward, and which never came. The next day Mr. Doud, in this city of from 60,000 to 70,000, rented an office for $8.33 a month, purchased second-hand furniture for the same, worth $17.25, and purchased stationery to the amount of $1.55, which constituted the equipment of the office.

Just before leaving he presented the following typewritten receipt for plaintiff to sign, which receipt was already prepared except the date:

"DES MOINES, IOWA, October 25, 1905.

"*Gentlemen:* We have opened the office to-day—also stock which has arrived. The following expenses have been paid out by your representative:

| | |
|---|---:|
| Rent | $10 00 |
| Furniture | 17 25 |
| Drayage | 1 00 |
| Stationery | 1 55 |
| | $29 80 |

"Your representative has fitted up my office in a satis- factory manner and instructed me thoroughly in the de- tails of the business. You have fully complied with your contract to date, and I feel well qualified to go ahead. You can rest assured of receiving my hearty co-operation at all times.

"Very respectfully yours,
"J. W. WARD.

"Room 526, Good Block."

Plaintiff says that he had objected to the kind of furni- ture provided, and the stock had not yet arrived, of which he had notified defendant by letter the day previous. The agent stated he was required to have a receipt for money expended, and plaintiff signed the statement. He followed the instructions given him and wrote for further instruc- tions, and received reply that there were no personal in- structions. The goods had not been consigned to him, but to "R. H. Gaines," a person unknown to him. He wrote several letters to defendant to trace the goods, and received the shipping bill to the above consignee, and found the goods on November 9, 1905. Plaintiff could get but few canvassers from the advertising recommended by the agent. He testifies that he became suspicious of the representations made to him by defendant that his concern was the largest of its kind from the unattractive appearance of the packages, and also as to the quality of the goods, and upon this consulted a chemist.

He wrote many letters to defendant reporting what he was doing as to canvassers and the business generally. On November 24, 1905, plaintiff sent defendant his

monthly statement with a letter. This was replied to by defendant, November 28th, calling his attention to paragraph 5 of the contract, which fixes a sale of not less than $500 a month as the minimum amount of business necessary to constitute the fulfillment of the contract. His letter and this statement are not in the record. He consulted an attorney, and presented for his examination the contract with defendant and all the correspondence, and instructed him to rescind the contract. This he did by letter to defendant, December 14, 1905. Plaintiff made a final statement, duly itemized, of all expenses incurred in the business, goods sold, goods received, and goods in storage, as follows: Expenses, $103.01; goods sold, $82.51; goods received, $1,002.12; goods on hand in storage, $918.30. Defendant refused to recognize the rescission of the contract, and suit was brought. The record presented to us upon a review of this case, which is brought to this court by defendant, is voluminous.

It will be proper first to refer briefly to the pleadings. There are three counts to plaintiff's declaration to which defendant pleaded the general issue. It is urged by defendant that the first count is inconsistent with the second and third counts in that the first is founded upon a breach of contract, and the second and third upon fraud, and that the court erred in not requiring plaintiff to elect upon which theory he would proceed, and cites *Haas* v. *Malto-Grapo Co.*, 148 Mich. 359 (111 N. W. 1059). We think that the cases are distinguishable, although the contracts involved are identical. In the case at bar the first count is founded upon a rescission of the contract, tender of the goods, and a demand for $1,000 paid by plaintiff, on account of the refusal of defendant, pursuant to the contract, to instruct the plaintiff sufficiently in the details of handling the business, thereby preventing the fulfillment by plaintiff.

In the case cited the suit was brought upon the contract for the breach thereof, thereby affirming the contract. The second and third counts were also founded upon a

rescission of the contract on account of false representations as to the quality of the goods. In neither of these counts is there an affirmance of the contract and a recovery sought upon defendant's promises. The only distinction between the counts is the grounds for the rescission. That there was a rescission of the contract on the part of plaintiff is not disputed.

The court was not in error in refusing to require plaintiff to elect upon which count he would ask for a recovery. Under the first count the court allowed the plaintiff to introduce evidence tending to prove one of the four grounds for rescission declared upon, namely, that defendant had not sufficiently instructed plaintiff as agreed in paragraph 2 of the contract, and refused to do so. The fraudulent representations relied upon, which plaintiff claimed were made orally and in writing, and upon which the court allowed him to go to the jury, were: That the defendant and his agents fraudulently represented to him that he intended to establish a permanent branch office and distributing depot at Des Moines, Iowa; that defendant fraudulently represented that he was the largest exclusive manufacturer of this line of goods in this country, and that he fraudulently represented the goods manufactured by him and shipped to plaintiff were equal in quality to the highest standard of such goods in this country or in Europe; and that experience on the part of plaintiff was unnecessary.

Evidence upon each of these propositions relied upon in his declaration was offered by him to establish his case, and was received by the court. Defendant argues at length that the declaration was not sufficiently broad to warrant the court in permitting much of this evidence to be received, and that error was committed in so doing. All of this evidence was material to the issue, and, in our opinion, the declaration was sufficiently broad to warrant its admission.

1. The errors assigned by the defendant in his first group of 10, as classified by him, relate to the admission of

letters which passed between these parties; the conversation with McGuire, who furnished a copy of the "booklet," describing the goods and their quality; and the answer of a question as to whether McGuire invited him to test any samples. These letters were material. They all of them contained inquiries on the part of plaintiff, and answers and representations on the part of defendant, which tended to establish plaintiff's claim of defendant's representations as to the quality of his goods, the magnitude of his production, and his statement of intention to establish a permanent branch and distributing depot. These were express statements, some of them in answer to direct inquiries of plaintiff, which plaintiff claimed were false and by which he was induced to enter into the contract. McGuire represented defendant, and the "booklet" he furnished was a copy of the same one defendant had previously sent to plaintiff. The letters also show the history of the transaction leading up to the contract, and that the advertisement which plaintiff claims contained a false statement was the inducement to the correspondence. That no tests were invited by McGuire might be considered as bearing upon the good faith of representations of quality furnished by him. It would be the only way that the quality of perfumes and toilet goods could be ascertained. It was not error to admit this proof in the case.

2. Twenty-five assignments of error upon exceptions to the "admission in evidence of letters, documents, evidence of acts of plaintiff, and other testimony relative to transactions between the parties, etc., all subsequent to signing the contract," are urged as errors prejudicial to defendant. Such of these as are claimed erroneous, and the evidence inadmissible, because of the claimed inconsistencies between the counts in the declaration, need no discussion, for the reason that our construction of the declaration, herein given, has disposed of the objection. His testimony and letters as to the canvassers employed by him, the difficulties in procuring them, and results, were material upon the question of defendant's having

given sufficient instruction to him, and representations as to the necessity of experience before undertaking this work. The letters from the Iowa and Michigan attorneys were admissible to show rescission. The last one was an affirmance of the first and a more explicit tender of goods. A letter notifying defendant that his agent Doud had been there and of the nonarrival of the stock, also relative to insurance on the stock and the answer thereto, were properly admitted. Errors are assigned upon the admission of three exhibits, which were afterwards stricken out. Such action cured the error, if any was committed. Short extracts from them were afterwards allowed only as bearing upon the matter of payment of salary. Two letters or parts of them were read in evidence, one written by plaintiff to defendant, and the other his answer. They related to the understanding of the parties relative to expenses of the business and salary. Each states his view. If error was committed, it was harmless in view of the fact that the court took from the jury later all consideration of the matter of expenses and salary. Ward's testimony, describing the office as furnished and fitted by defendant, was admissible as bearing upon intention to establish a permanent branch distributing depot ; how the goods were packed and displayed also.

3. The court allowed in evidence a sample case, furnished by defendant, containing 50 samples of products of defendant, which were the basis of tests made by plaintiff of the quality of these goods. Defendant objected because not sufficiently identified. It appears that this was an old sample case and was not locked when received by plaintiff with its contents. The evidence offered relative to its identity was proper to submit to the jury to determine identity.

4. Under this subdivision the only objection, for which a reason is given, was to an inquiry as to whether or not plaintiff became suspicious as to the statement of defend-

ant about conducting the largest exclusive manufactory of these goods. It was clearly admissible.

5. Errors are assigned upon evidence admitted relative to other similar cases, which in the briefs are called collateral cases. The record shows that there were 30 persons attracted by this advertisement, who entered into contracts indentical with the one plaintiff signed. Four of these agents were produced as witnesses by plaintiff and allowed to testify. This testimony was offered and admitted to show similar transactions by defendant with other parties as bearing upon the fraudulent intent of defendant. The testimony of these four witnesses shows that that same advertisement was answered; the same preliminary letters and later correspondence was had; the same contract was signed, and $1,000 cash was paid by each after coming to Detroit, and being met in the same way and told the same story, which was relied upon; the circumstances of fitting out the office; giving instructions; securing the prepared written receipt; the sudden departure of the representative; the late arrival of the goods; the old sample case and contents; and the representations made were in each case practically indentical with those in plaintiff's case. This evidence was admissible upon the ground claimed. *Beebe* v. *Knapp*, 28 Mich. 53; *Stubly* v. *Beachboard*, 68 Mich. 401 (36 N. W. 192), and cases cited.

It is urged that the court allowed too great latitude in the examination of these witnesses, permitting them to give their understanding of the contract. It was necessary and proper to go into the entire history of each of these cases. The allowance of this evidence objected to, in view of the exact and explicit charge upon this line of proof, was not prejudicial to defendant. The fact that the other contracts were made, as stated by these witnesses, was not disputed, nor was it denied that the letters sent before and after the contracts were executed were sent by defendant.

6. On the offer by plaintiff " to show that sales of mer-

chandise, such as that manufactured by the defendant, could not be made without experience," the testimony was excluded on the objection of defendant. The defendant was the next witness called, and on his direct examination, after testifying that he had talked with plaintiff about the matter of the statement in the advertisement, and also testified to his own lack of experience, was asked:

"*Q.* As a matter of fact, in order to sell your goods, does a man have to have any experience in selling that line before?"

Plaintiff objected and called attention to the above ruling of the court upon the same ground in defendant's favor. The court sustained the objection. This was not erroneous. Defendant was simply required by the court to be consistent. Any other course in the trial of a cause would lead to great confusion and would be disastrous.

7. On cross-examination of defendant, relative to the form of this contract, he was asked, under objection, where he obtained it, and was permitted to answer. It is claimed that in this the court was in error. From this cross-examination it appears that in the contract the words "it" and "its" were used in referring to defendant instead of "he" or "his." He testified that he did not get the contract from a corporation; that he obtained the idea from a concern which recommended it to him. He, however, insisted that he wrote this contract specially for the plaintiff; that in using these words he referred to himself and the business. We think the cross-examination was proper in this case where fraud was charged. It would be a legitimate inference for the jury to draw from this testimony that the purpose of defendant was to misrepresent, in using these words, the character and importance of his concern.

8. Several errors are assigned upon testimony of plaintiff permitted by the court relative to his reliance upon the representations of defendant (*a*) that experience was

unnecessary; (*b*) that the quality of goods was the highest; (*c*) that he proposed to establish a permanent branch office at Des Moines; (*d*) that salary and expenses of the office would be paid monthly when he entered into the contract. The objection made is that the evidence was immaterial, irrelevant, and incompetent, and not within the allegations of the declaration. The court indicated that he would permit the declaration to be amended if necessary. We have already held that the declaration was sufficient in law to sustain a recovery in this case. It follows, therefore, that this evidence, except that relative to salary and expenses, was material to the issue and properly admitted. The court in charging the jury refused to charge as requested by plaintiff as to the representations as to salary and expenses, and refused in his general charge to submit that question to the jury. This eliminated all of the evidence relative to representations as to salary and expenses from the case.

In our opinion, when plaintiff closed his case, he had presented evidence sufficient to entitle him to have it considered by the jury, and it was not error to deny defendant's motion for an instructed verdict.

9. Many of the assignments of error to the charge are upon the ground that the court did not specifically point out to the jury that he withdrew from their consideration all evidence in the case relative to the alleged fraudulent representations in regard to the payment of salary and expenses. In this case defendant presented to the court no requests to charge, and did not call the attention of the court to what he now claims in these assignments to be erroneous omissions to charge.

This charge of necessity was very long, and the court clearly and distinctly stated to the jury the questions which might be considered by it. As already stated, the matter of these representations was not submitted to the jury. The rulings of the court, during the whole of the trial, distinctly show that was the view he took of the question, except in one instance, where one question was

allowed to stand, evidently by some oversight, and which, we have said, was cured by the charge. We think the charge was sufficiently explicit upon the question not to mislead the jury. Defendant's duty to the court was to call its attention by written requests or orally to this matter. The court is not inclined to extend the scope of the statute allowing assignments of error to the charge after the trial.

Errors are assigned to parts of the charge as given.

(1) Relative to the advertisement, the court said that if they could find—

"That the defendant meant by the use of that language that no experience in the handling of these goods as a general sales agent was necessary, then I say to you that that language may be the subject of a fraudulent representation."

Turning back to this advertisement, it will be seen that it contains the words "experience unnecessary." This portion of the charge is claimed to be error because the court failed to define the word "necessary." This was language adopted by defendant in what plaintiff claims was part of a fraudulent scheme to relieve applicants of $1,000. We have before us in this record the fully developed scheme, and this advertisement was in fact for general sales agents in this defendant's line. It may now be read and considered in the light of the whole case made by plaintiff. There is no denial that this was the business, and these were the agents sought by defendant in his advertising invitation to applicants having "$1,000 and good references," to undertake to manage a "branch office and distributing depot for large manufacturer." The court properly instructed the jury upon this advertisement.

(2) Defendant claims that the court erred in charging that it was not necessary for plaintiff to prove all of these fraudulent representations in order to recover, but that, if they should find any one a fraudulent representation, plaintiff was entitled to recover, and it was prejudicial and misleading. It is not claimed that this does not state the

law, but that it does not occupy the proper place in the charge. The objection is without merit.

(3) The court charged the jury at great length upon that feature of the case which related to instructions given to plaintiff by defendant under the contract. In one clause of the contract defendant agreed to instruct plaintiff in the details of handling the business until he was sufficiently instructed, in the estimation of defendant. The court, among other things, said that defendant must deal fairly and justly with plaintiff; that the clause must be construed reasonably; that defendant was called upon under the contract to do what he in good faith thought was reasonably necessary in instructing plaintiff in the duties of a general sales agent. After saying this, and much more of like effect, he finished by giving the paragraph excepted to:

" If you shall find, then, from the evidence, that the defendant knew, at the time the plaintiff rescinded the contract, that the plaintiff was not sufficiently instructed in the details of handling the business, then defendant broke his contract," and this breach was such as authorized the rescission, and, if they so found, plaintiff was entitled to recover.

The record contains much evidence upon this subject tending to show defendant did not sufficiently instruct plaintiff. It appears that plaintiff had no experience in this line of business; that all the instructions he received from defendant were meager; that he wrote defendant nearly every day, and in many of the letters he is asking for instructions and information. The answers were before the jury, as also one in which defendant practically states that plaintiff needs no personal instructions. The court was correct in saying that this pledge in the contract to instruct meant a reasonable and good faith instruction by defendant. The evidence made this a question of fact for the jury.

10. There was testimony in the case relative to damages

sustained by plaintiff by reason of loss of other employment to entitle its submission to the jury.

11. Special questions were submitted to the jury on the part of the plaintiff as follows:

(1) Did plaintiff when he signed the contract rely on the statement made to him by defendant, Cook, that defendant, Cook, intended to establish a permanent branch office and distributing depot at Des Moines, Iowa? The jury answered, "Yes."

(2) Did defendant, Cook, on October 10, 1905, intend to establish a permanent branch office and distributing depot at Des Moines, Iowa? The jury answered, "No."

(3) Did defendant, Cook, instruct or cause plaintiff, Ward, to be instructed in the details of handling the business, until plaintiff, Ward, was sufficiently instructed, in the estimation of defendant, Cook? The jury answered, "No."

Defendant argues that they are not questions which control the issue. We disagree with counsel for defendant, and refer to the questions as conclusive upon the proposition, and cite the authority upon which he relies. *Cousins* v. *Railway Co.*, 96 Mich., at page 389 (56 N. W. 14), *et seq.* These questions do not ask for findings upon facts not vital to the case, but findings necessarily conclusive of plaintiff's right to recover.

It follows as a necessary conclusion, from the view we take of this case, that the motion for a new trial by defendant was properly denied by the court. The case was submitted to the jury by the court in his charge by a clear and correct statement of the law, as applied to the facts of the case. The jury under this charge found a verdict in favor of plaintiff. This, in our estimation, was amply justified by the evidence.

The judgment is affirmed.

MONTGOMERY, OSTRANDER, HOOKER, and BROOKE, JJ., concurred.